UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

LARRY FUQUA,

          Plaintiff,

      v.

THE KENAN ADVANTAGE GROUP, INC.,
aka REINHARD TRANSPORTATION/KAG
WEST,

          Defendant.

3:11-cv-01463 -ST

FINDINGS AND
RECOMMENDATION

STEWART, Magistrate Judge:

Plaintiff, Larry Fuqua, filed a Complaint in state court alleging claims for statutory

wrongful discharge and retaliation in violation of ORS 652.062, common law wrongful

discharge, and unpaid wages against defendant, Kenan Advantage Group, Inc., aka Reinhard

Transportation/KAG West ("Kenan"), and seeking damages for lost back pay and benefits with

interest, reinstatement or front pay with interest, non-economic damages, and attorney fees.

Kenan timely removed this case to federal court on December 6, 2011, asserting diversity

jurisdiction under 42 USC § 1332.  Because Fuqua is a citizen of the State of Oregon and Kenan

is a Delaware corporation with its principal place of business in Ohio, and the amount in

controversy exceeds $75,000.00, this court has jurisdiction.  Kenan has filed a Motion to Compel

1 - FINDINGS AND RECOMMENDATION

Arbitration and to Dismiss, or in the Alternative, to Stay this Action (docket # 11).  For the

reasons set forth below, Kenan's motion should be deferred pending resolution of the factual

dispute over whether the parties agreed to arbitration.

## ALLEGATIONS

Fuqua is a truck driver with 20 years of experience and is knowledgeable about truck

safety standards.  Fuqua Aff.,[1] ¶ 1.  Kenan is a transportation and logistics company that

transports fuel and chemical products throughout the United States through its subsidiaries,

including KAG West, LLC.  Edwards Decl., ¶ 2.  Fuqua was employed by KAG West.  *Id.*  KAG

West provides short-haul delivery of fuel products from pipelines, railcars, and refineries to

gasoline stations, fuel marketers and other end-users.  *Id*, ¶ 3.

## I.      Employment Application and Arbitration Agreement

On April 13, 2010, at home in the presence of his wife, Kim Fuqua, Fuqua completed a

Driver Application for employment with KAG West.  Fuqua Aff., ¶ 2; Kim Fuqua Aff., ¶¶ 2-3;

Response to Motion to Dismiss (docket # 20) ("Response"), Ex. 1.  Lisa Reinhard ("Reinhard"),

KAG West's Safety Manager, sent Fuqua additional forms by email on May 4, 2010.  Response,

Ex. 2.  These forms included a Binding Arbitration Agreement ("Arbitration Agreement") which

states as follows:

> In the unlikely event of a dispute between myself and KAG West LLC, its
> employees or agents having anything to do with my employment or
> separation from employment, we agree that all such claims will be settled
> by binding arbitration by a neutral arbitrator under the rules of the
> American Arbitration Association (AAA) and any procedures required by
> law.  This means that we both give up the right to have the dispute decided
> in court by a jury.  Instead, an impartial arbitrator whose decision is final
> will resolve it, subject to judicial review as provided by law. . . .  Examples

---

[1] The parties have submitted affidavits and declarations with various attachments.  Citations to the declarations and affidavits are identified by the last name of the witness.

2 - FINDINGS AND RECOMMENDATION

of disputes that we agree to submit to arbitration include but are not limited to: claims for . . . wrongful termination. . . and all other claims related to any aspect of the employment relationship, regardless of whether the claim is brought by myself or KAG West LLC.  The arbitration shall be held at a mutually convenient location in California . . . I understand that I have up to seven (7) days from the date I receive this Agreement to consult with legal counsel of my own choosing and at my own expense and, if I so decide, to notify KAG West LLC, in writing that I do not want to be bound by this Agreement.  If such notice is received within this period, this Agreement shall be revoked.  I understand and KAG West LLC, agrees that my electing not sign this Agreement or my providing written notice revocation will not affect the decision to hire me or my employment status in any way. . . .

*Id*, Ex. 3.

Fuqua signed an Arbitration Agreement at his home on May 6, 2010, but first crossed out "California" and replaced it with "Oregon" as the location of arbitration.  Fuqua Aff., ¶ 4; Kim Fuqua Aff., ¶ 3.  He met with Dale Swanson ("Swanson"), KAG West's Terminal Manager, on May 13, 2010, and placed the signed agreement in his in-box as directed.  Fuqua Aff., ¶ 4.

Swanson told Fuqua on May 15, 2010, that the company wanted him to sign another Arbitration Agreement form.  *Id*, ¶ 5.  Fuqua made the same change of arbitration location from California to Oregon and returned the signed form to Swanson.  *Id*.  On or about June 3, 2010, Swanson told Fuqua more application paperwork was needed, as well as a "re-do" of the safety equipment form and another Arbitration Agreement.  *Id*, ¶ 6.  Fuqua made the same change of California to Oregon as before and told Swanson that he did not think it was fair for him to have to pay for the costs to travel and stay in California to do any arbitration.  *Id.*  Swanson made no comment.  *Id.*  Swanson contacted Fuqua several more times asking him to sign the Arbitration Agreement and other forms.  *Id*, ¶ 7.  Each time, Fuqua changed the location from California to Oregon.  *Id.*  Fuqua explained, "Mr. Swanson did not tell me that I should not do that anymore and since the form said I did not have to sign it at all, I did not think KAG could make me sign it

3 - FINDINGS AND RECOMMENDATION

or that it would affect my employment.  Up to that time, no one told me I had to sign it

unchanged or lose my job."  *Id.*

In January 2011, Swanson asked Fuqua to sign another Arbitration Agreement, and

Fuqua again told him that the location for arbitration should be changed to Oregon and that the

form says he is not required to sign it.  *Id*, ¶ 9.  Swanson responded that it was "no big deal" if he

did not sign it unchanged, but then added "nice working with you and see ya [sic] around."  *Id.*

Fuqua believed that he could lose his job if he did not sign it unchanged.  *Id.*  Nevertheless,

Fuqua made the same location change as before, signed the form and returned it to Swanson's

desk.  *Id.*  Swanson said nothing more to him about the Arbitration Agreement.  *Id.*

Kenan disputes when and what Fuqua signed.  Swanson asserts that he watched Fuqua

complete and sign both the updated Driver Application (which must be dated within 30 days of a

driver's date of hire) and Arbitration Agreement in his presence on May 13, 2010.  Swanson

Decl., ¶ 3; Suppl. Swanson Decl., ¶ 3; Edwards Decl., Ex. A.  That same day, Swanson

administered two pre-hire tests to Fuqua which he passed.  Suppl. Swanson Decl., ¶ 3.  After

Fuqua signed the Arbitration Agreement, Swanson forwarded the tests and Arbitration

Agreement to Reinhard, which she countersigned for Kenan.  Swanson Decl. ¶¶ 3, 4; Reinhard

Decl., ¶ 4.  These documents, both showing dates of May 13, 2010, and containing Fuqua's

signature, were scanned and kept in Fuqua's Driver Qualification File.  Edwards Decl., ¶ 6,

Exs. A & B; Suppl. Edwards Decl., ¶ 2.  Swanson asserts that neither he nor anyone to his

knowledge altered these signatures.  Swanson Decl., ¶ 3; Suppl. Swanson Decl., ¶ 3.  Fuqua did

not ask Swanson or Reinhard any questions about the Arbitration Agreement, make any changes

to the Arbitration Agreement, or indicate that he had any objections or reservations about signing

the Arbitration Agreement.  Swanson Decl., ¶ 3; Reinhard Decl., ¶ 4.

4 - FINDINGS AND RECOMMENDATION

## II.      Employment at Kenan

Fuqua commenced employment at KAG West on or about May 14, 2010. Swanson

Decl., ¶ 5.

During his employment, he made several complaints about the condition of company

trucks and documented problems on vehicle inspection reports. Fuqua Aff., ¶ 8. He also

complained about Reinhard's conduct in September 2010, which he considered unethical, and

requested an investigation. *Id.* Fuqua reported through Kenan's telephone hotline and in a

written complaint to headquarters that Reinhard and her husband, the original owners of KAG

West, were covering up poor maintenance on the trucks. *Id*, ¶ 14. In one incident, the steering

broke and his truck ran into a ditch. *Id*; Response, Exs. 5 & 6.   Fuqua's time log was also

altered to report that he worked over the legal 16-hour shift by showing he took a 9 ½ hour break

rather than a mandatory 10 hour break between shifts. Fuqua Aff., ¶ 14; Response, Ex. 6.

On February 4, 2011, Swanson wrote Fuqua the following note: "You cannot write up

the items you checked w/o merit. The shop checked every item, and besides the tilt steering

found everything ok. I would suggest maybe finding a carrier w/ new equipment." Response,

Ex. 4.

On February 5 and 6, 2011, Fuqua was delivering gas for stations in Portland and Eastern

Oregon. Fuqua Aff., ¶ 16. He experienced work delays for about an hour. *Id.* When he reached

Maupin, Oregon, he explained to dispatch that he would not have time to deliver the next load

within the shift and requested directions for how to proceed. *Id.* At Warm Springs, Oregon, he

received an urgent message through Cadec[2] instructing him to pull over and call dispatch. *Id*,

¶ 17. Dispatcher Gary explained his delivery had to be made or the station would run out of fuel

---

[2] Cadec is a vehicle tracking and message system in which text message communications between the dispatcher and
truck drivers are recorded. Fuqua Aff., ¶ 16; Response, Ex. 8.

5 - FINDINGS AND RECOMMENDATION

and noted, "you know the consequences if they run out of fuel," implying that Fuqua could get

fired. *Id.* Gary told him to "do your best to get back to Madras." *Id*. Fuqua explained that he

could not get to Madras within the 16-hour limit and was told to try and go as far as he could. *Id.*

Fuqua continued to communicate with dispatch throughout the night about his delays. *Id*,

¶ 18. He told dispatcher Laura that he did not think he had enough time to get to Madras and the

best he could do was get to an abandoned rest stop just north of Ramms Road. *Id.* She told him

that if that was the best he could do, then do it. *Id.* Fuqua told Laura that if she wanted him to

stay with the truck past the 16-hour limit then he wanted it in writing through Cadec, otherwise

he would have his wife pick him up. *Id.* He was concerned about staying past the 16-hour limit

without permission recorded in Cadec because of being written up previously in August 2010.

*Id.*

After his wife arrived to drive Fuqua home, dispatcher Laura called and explained that

they would not put it in writing for him to stay with the truck. *Id*,¶ 19. He asked permission to

leave and Laura responded that since his wife was there, he might as well. *Id.* She told him to

leave his keys where he usually leaves them. *Id.*

Fuqua then received a call from Swanson who told him to stay with the truck. *Id, ¶* 20.

Fuqua explained that dispatch had told him he could go home, that he had done what was

required, and that if he was not given permission to stay beyond the 16-hour limit, then he had no

choice but to go home so he did not break the law. *Id.* He told Swanson "if you are going to

write me up just write me up otherwise just leave me alone. I need to get some sleep." *Id*; Kim

Fuqua Aff., ¶ 7. Swanson never told Fuqua what rule or policy he violated. Fuqua Aff., ¶ 21.

Swanson asserts that he told Fuqua to stay with the truck until help arrived, but Fuqua

refused and instead stated words to the effect of "write me up." Swanson Decl., ¶ 6.

6 - FINDINGS AND RECOMMENDATION

Abandoning the truck during a shift is a violation of KAG West policy.  *Id &* Ex. B.  The next

day on February 7, 2011, KAG West terminated Fuqua's employment.  *Id*, Ex. C.

On April 22, 2011, Fuqua's counsel sent a letter to Kenan's Human Resources Manager

requesting Fuqua's personnel records.  Suppl. Edwards Decl., Ex. A.  On June 27, 2011,[3] he sent

a letter to Kenan's counsel suggesting they begin settlement discussions.  Response, Ex. 9; Stark

Aff., ¶ 2.  In November 2011, Kenan asked Fuqua to stay or dismiss his lawsuit and submit the

matter to binding arbitration.  Sherman Decl., ¶ 2.  Fuqua filed this lawsuit on December 13,

2011.

## FINDINGS

### I.     Applicability of the FAA

The Federal Arbitration Act ("FAA") mandates that written arbitration agreements

involving interstate commerce "shall be valid, irrevocable, and enforceable, save upon such

grounds as exist at law or in equity for the revocation of any contract."  9 USC § 2.  The Ninth

Circuit has recognized that the FAA reflects Congress' intent to provide for the enforcement of

arbitration agreements within the full reach of the commerce clause.  *Republic of Nicaragua v.*

*Standard Fruit Co.*, 937 F2d 469, 475 (9th Cir 1991) citing *Perry v. Thomas*, 482 US 483, 490

(1987).  "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of

arbitration."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 US 1, 24-25 (1983).

However, the FAA contains an exemption from the basic coverage authorization of § 2.

The exemption clause of §1 provides that the FAA shall not apply "to contracts of employment

of seamen, railroad employees, or any other class of workers engaged in foreign or interstate

commerce."  9 USC § 1.  As a transportation worker engaged in interstate commerce, Fuqua

---

[3]  This is the correct date as shown on the second page of the letter. The April 22, 2011 date on the first page is a
typographical error.

7 - FINDINGS AND RECOMMENDATION

argues that even if he signed the Arbitration Agreement, it is an employment contract excluded from the FAA.

Kenan argues that the Arbitration Agreement is not a "contract of employment" under § 2 of the FAA, citing several cases in support. However, those cases are distinguishable. In *Gilmer v. Interstate/Johnson Lane Corp.*, 500 US 20, 25 n2 (1991), the court compelled arbitration because the arbitration agreement was part of a securities application registration and not the employment contract. In *Terrebonne v. K-Sea Transp. Corp.*, 477 F3d 271, 274 (5th Cir 2007), the arbitration agreement was signed at the conclusion of a settlement agreement relating to damages paid for the seaman's injuries and not at the time of his employment. In *Harrington v. Atl. Sounding Co.*, 602 F3d 113, 121 (2nd Cir 2010), the arbitration agreement was signed upon the injured seaman's request for additional financial support. Here, in contrast, Fuqua is a commercial truck driver who was asked to sign an arbitration agreement upon commencing his employment.

Kenan attempts to distinguish the Arbitration Agreement at issue here on the basis that it is an independent and stand-alone document and not simply one of many terms in a written employment contract. As noted by the Second Circuit, "[t]he Supreme Court has recognized that if the term 'contracts of employment' was read so broadly as to include independent arbitration agreements, then every seaman's contract would be exempt from the FAA, thereby rendering the separate exemption for 'contracts of employment. . .' pointless." *Id* at 121, quoting *Circuit City Stores, Inc. v. Adams*, 532 US 105, 113 (2001). This argument is rejected for two reasons.

First, the citation by the Second Circuit to *Circuit City* refers to an unwarranted exemption for "all contracts of employment" which the Supreme Court felt would render pointless the separate exemption under § 1 of the FAA. While rejecting "a construction which

would exempt all employment contracts from the FAA," the Supreme Court in *Circuit City* expressly recognized that "Section 1 exempts from the FAA only contracts of employment of transportation workers." *Circuit City Stores, Inc.,* 532 US at 119.   It is that specific exemption for transportation workers which Fuqua invokes here.

Second, the Arbitration Agreement was presented to Fuqua at the same time as his Driver Application.   The two documents were both placed in Fuqua's Driver Qualification file.   Both documents address employment-related issues.   Although contained on separate sheets of paper, the documents are so closely intertwined that they should be construed as one.   In *Pollock v. Horton*, 190 Or App 1, 77 P3d 1120 (2003), the court noted that the employment agreement and the asset purchase agreement "were parts of the same transaction, and they are so closely interconnected . . . . We therefore treat them as parts of one contract." *Id* at 11, n11, 77 P3d at 1127 n11.  Oregon courts have also recognized that "[w]hen parties contemporaneously execute multiple agreements that address interrelated subjects, we are bound to construe them together as one contract to discern the parties' intent." *Snow-Mountain Pine, Ltd. v. Tecton Laminate Corp.*, 126 Or App 523, 528, 869 P2d 369, 372 (1994).

Accordingly, this court concludes that the Arbitration Agreement is part of an employment contract for a worker engaged in interstate commerce and, thus, is exempt under §1 of the FAA.

## II.     Existence of an Agreement

Even though the FAA does not apply, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit." *Steelworkers v. Warrior & Gulf Nav. Co.,* 363 US 574, 582 (1960).  Whether parties have agreed to "submi[t] a particular dispute to arbitration" is typically an "issue for judicial determination."

*Howsam v. Dean Witter Reynolds, Inc.*, 537 US 79, 83 (2002), quoting *AT & T Technologies, Inc. v. Communications Workers of Am.*, 475 US 643, 649 (1986).  Similarly, where the dispute at issue concerns contract formation, the dispute is generally for courts to decide.  *See, e.g., First Options of Chicago, Inc. v. Kaplan*, 514 US 938, 944 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary . . . principles that govern the formation of contracts").[4]

The court must apply Oregon contract law to resolve questions concerning formation of the agreement.  *See Lowden v. T-Mobile USA, Inc.*, 512 F3d 1213, 1217 (9th Cir 2008); *see also First Options of Chicago*, 514 US at 944.  Under Oregon law, "before there can be a valid contract there must be a meeting of the minds as to all of its terms; that nothing can be left for future negotiation, and that if any portion of the contract is not agreed upon, or if no method is agreed upon by which such a term or provision can be settled, there is no contract."  *Phillips v. Johnson,* 266 Or 544, 555, 514 P2d 1337, 1343 (1973) (citations omitted).

Oregon law does not necessarily require a signature to create a contract.  "If a written contract is intended merely to serve the purpose of a memorial of a completed contract already made, the failure to execute the writing does not prevent the existing agreement from binding the parties;" however, there must be other manifestations of assent.  *Western Bank v. Morrill*, 245 Or 47, 420 P2d 119, 125 (1966) (citations omitted).  Only "sufficient consideration," not strict

---

[4]   Under the FAA, a challenge to the validity of the arbitration clause itself is decided by the court, not the arbitrator.  *Buckeye Check Cashing, Inc. v. Cardegna,* 546 US 440, 446 (2006).  If, on the other hand, a party challenges "the validity of the contract as a whole, and not specifically to the arbitration clause," then the issue of arbitrability "must go to the arbitrator."  *Id* at 449.  Here Fuqua challenges the validity of the arbitration clause only in opposition to Kenan's motion to compel arbitration.  When a party "does not concede that he is bound by the arbitration clause . . . but raises it as a defense to a motion to compel arbitration brought against him in federal court," then the court properly decides the issue "of arbitrability."  *Cox v. Ocean View Hotel Corp.*, 533 F3d 1114, 1121 (9th Cir 2008).  Because Fuqua challenges the arbitration clause, rather than his employment contract as a whole, the court decides the issue of arbitrability even if the FAA applies.

10 - FINDINGS AND RECOMMENDATION

mutuality of obligation, is required in an arbitration agreement. *Motsinger v. Lithia Rose-FT Inc.,* 211 Or App 610, 619-22, 156 P3d 156, 162-64 (2007).

Fuqua states that he rejected Kenan's form Arbitration Agreement by replacing California with Oregon as the location of arbitration. Kenan did not accept his counter-offer and instead tried to coerce him to agree to arbitration in California. On multiple occasions Swanson asked Fuqua to sign the form Arbitration Agreement without changing the location of arbitration. Fuqua signed it only after changing the location. Thus, he contends that there was never a "meeting of the minds" as required for a valid contract under Oregon law. *Martin v. Comcast of California/Colorado/Florida/Oregon, Inc.*, 209 Or App 82, 96-97, 146 P2d 380, 399-89 (Or App 2006).

Fuqua also argues that his signature on the Arbitration Agreement form submitted by Kenan dated May 13, 2010, is a forgery. He notes that the signature on Kenan's copy is slanted and otherwise suspect. Moreover, he believes discovery will reveal more information as to Kenan's propensity to commit fraud, such as testimony from the two dispatchers he talked with on February 5 and 6, 2011, and email exchanges between Swanson and Reinhard.

Kenan disputes the accuracy of Fuqua's affidavit and charge of forgery. First, it points out that a document may be authenticated by the testimony of a witness with knowledge or a nonexpert's opinion that the handwriting is genuine, based on a familiarity with it that was not acquired for the current litigation. FRE 901(b)(1) & (2). Because Swanson observed Fuqua sign the unchanged Arbitration Agreement on May 13, 2010, the document has been authenticated. Suppl. Swanson Decl., ¶ 3. Thus, Fuqua has the burden to prove that the Arbitration Agreement in its file has been modified or forged.

Kenan argues that Fuqua has not met his burden, citing *Cadaval v. Dean Witter Reynolds, Inc.*, 703 F Supp 922, 924 (SD Fla 1989).  In *Cadaval*, plaintiffs attacked the arbitration agreement by stating that "they do not remember signing [the agreements] and that these agreements *may* be forgeries because some other documents were allegedly not genuine."  *Id* (emphasis in original).  The court noted that "the party opposing the Motion to Compel Arbitration has the affirmative duty of coming forward by way of affidavit or allegation of fact to show cause why the court should not compel arbitration."  *Id*, citing *Aronson v. Dean Witter Reynolds, Inc.*, 675 F Supp 1324, 1325 (SD Fla 1987).  Plaintiff's conclusory allegations were held insufficient to satisfy this affirmative duty.

Here, in contrast, Fuqua has provided more than mere allegations.  He has submitted his affidavit and an affidavit from his wife stating that he only signed the Arbitration Agreement after changing the location from California to Oregon.  This situation is clearly distinguishable from *Cadaval* in which the plaintiffs did not conclusively deny signing the agreement.  Thus, Fuqua has met his burden of submitting sufficient facts to create a genuine dispute.

Second, Kenan maintains that Fuqua agreed to arbitrate his employment claims and only disagreed as to the location of the arbitration which is an immaterial term that may be ignored.  Although Fuqua may have rejected California as the location, Kenan has now waived that provision and agrees that the arbitration may occur in Oregon.  The problem with this argument is that Fuqua treated the location of arbitration as a material term that caused him to reject it time and again.  Furthermore, the fact that Kenan is now willing to arbitrate in Oregon is irrelevant to the parties' intent at the time of the alleged formation of the contract.

Third, Kenan argues that Fuqua's counsel acknowledged and did not challenge the validity of the Arbitration Agreement in his April 22, 2011 letter to Kenan's Human Resources

Manager.  Suppl. Edwards Decl., ¶ 3, Ex. A.  That argument reads too much into the letter.  The

purpose of the letter was to obtain copies of Fuqua's personnel records and states only that "there

was an arbitration policy provided that may not be legal in Oregon and it would be helpful to

know if the company intends to require arbitration of any dispute."  *Id.*  This cannot be construed

as any sort of admission, particularly when Fuqua's counsel sent a second letter dated June 27,

2011, to Kenan's counsel specifically stating that Fuqua only signed the Arbitration Agreement

after changing California to Oregon.  Response, Ex. 9.

Kenan also makes a number of other arguments to cast doubt on Fuqua's credibility.   It

notes with suspicion that Fuqua has submitted some documents regarding his employment, but

not the Arbitration Agreements on which he claims to have changed the location.  Fuqua offers

no explanation why Kenan repeatedly asked him to sign the same Arbitration Agreement and has

produced no evidence to suggest that Swanson and Reinhard have made false statements.  Kenan

also notes that Fuqua was asked to make changes to the Driver Application after the date he

claims to have signed it, suggesting that not all of the forms were signed in April 2010.  More

significantly, it questions why Swanson would ask Fuqua to sign the Arbitration Agreement at

least four different times after May 13, 2010, when Reinhard countersigned it.  Finally, it argues

that Fuqua could have provided a written revocation of the Arbitration Agreement on any

occasion but instead only changed the arbitration location.

These arguments, no matter how persuasive, do nothing more than highlight the factual

nature of the dispute between the parties.  Fuqua states under oath that he did not sign the

Arbitration Agreement which Kenan has submitted to the court.  Swanson states the exact

opposite under oath.  This is a credibility issue that cannot be resolved based on competing

affidavits.  Therefore, prior to resolving Kenan's motion, an evidentiary hearing must be held to

13 - FINDINGS AND RECOMMENDATION

determine whether a valid Arbitration Agreement exists.[5]  Since the parties have the right to a

hearing on this issue, a ruling on whether the parties actually formed an Arbitration Agreement

must be deferred.

However, even if the parties agreed to the Arbitration Agreement submitted by Kenan,

the parties raise other arguments that can be resolved as a matter of law.  They are addressed

next.

### III.      Enforceability of Agreement

Assuming there is a valid Arbitration Agreement, the parties dispute its enforceability.

They dispute whether it is voidable under Oregon law, who should determine its enforceability,

and whether it is unconscionable.

### A.      ORS 36.620 (5)(A)

Fuqua first contends that the Arbitration Agreement, even if signed by him on May 13,

2010, without change, violates ORS 36.620(5).  That statute provides that arbitration agreements

between an employer and employee are voidable unless:

> (a) At least 72 hours before the first day of the employee's employment,
> the employee has received notice in a written employment offer from the
> employer that an arbitration agreement *is required as a condition of
> employment*, and the employee has been provided with the required
> arbitration agreement that meets the requirements of, and includes the
> acknowledgment set forth in, subsection (6) of this section; or
> (b) The arbitration agreement is entered into upon a subsequent bona fide
> advancement of the employee by the employer.

ORS 36.620(5)(a) & (b) (emphasis added).

---

[5]  Even if the FAA applies, this is still an issue for the court to resolve.  Under § 4 of the FAA, "If the making of the
arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed
summarily to the trial thereof.  If no jury trial be demanded by the party alleged to be in default, or if the matter in
dispute is within admiralty jurisdiction, the court shall hear and determine such issue."  9 USC § 4; see *Bettencourt
v. Brookdale Senior Living*, 2010 WL 274331 at *5 (D Or) ("As noted, under § 4 of the FAA, when an issue of fact
exists as to the formation of an agreement, the Court must summarily proceed to a jury trial on the issue.").

On its face, the Arbitration Agreement appears to fall outside this statute because it contains express language that it is not a condition of employment. Edwards Decl., Ex. B ("I understand and KAG West LLC, agrees that my electing not to sign this Agreement or my providing written notice of revocation will not affect the decision to hire me or my employment status in any way."). However, Fuqua argues that based on Swanson's statements, it became a "take it or leave it" condition of his employment.

As previously noted, a fact dispute exists as to whether and when Fuqua signed the Arbitration Agreement. Regardless of the outcome of that dispute, the result is the same. If Fuqua's testimony is believed that he never signed the Arbitration Agreement submitted by Kenan, then there is no contract to void under this statute. If, on the other hand, Swanson is believed that Fuqua signed the Arbitration Agreement on May 13, 2010, then Fuqua did so before Swanson made it a condition of his employment in January 2011. In that event, Fuqua signed it voluntarily and not "as a condition of employment," rendering the statute inapplicable. Therefore, ORS 36.6210 does not assist Fuqua.

### B.      Delegation Provision

Kenan next argues that the arbitrator, and not the court, must decide whether the Arbitration Agreement is enforceable. "If the court concludes that the parties did not clearly and unmistakably intend to delegate arbitrability decisions to an arbitrator, . . . the question of arbitrability is for judicial determination." *Qualcomm Inc. v. Nokia Corp.*, 466 F3d 1366, 1371 (Fed Cir 2006) (citations and quotations omitted). In *Rent-A-Center, West Inc. v. Jackson*, ___ US ___, 130 S Ct 2772, 2775 (2010), the arbitration agreement provided that the arbitrator "shall have exclusive authority to resolve any dispute relating to the . . . enforceability of this Agreement." The Supreme Court held that this clear delegation provision is valid. *Id* at 2779.

That led to another issue, namely whether a party challenged the contract as a whole, which must

be decided by the arbitrator, or only the enforceability of the agreement to arbitrate (the

delegation provision), which must be decided by the court. *Id* at 2778-79.   Because the plaintiff

in *Rent-A-Center* did not challenge the delegation provision in any of the courts below,

arbitrability was an issue for the arbitrator to resolve. *Id* at 2779-80.

Here, the Arbitration Agreement contains no express delegation provision as in *Rent-A-*

*Center*.  Instead, it incorporates the rules of the American Arbitration Association ("AAA")

which provide that "all such claims will be settled by binding arbitration by a neutral arbitrator

under the rules of the [AAA]."  Edwards Decl., Ex. B.  AAA Rule 6 provides that the arbitrator

"shall have the power to rule on . . . any objections with respect to the existence, scope of

validity of the arbitration agreement."  Request for Judicial Notice (docket # 17), Ex. A., p. 20.

Judge King has held that in cases where the FAA applies and the parties agree to the application

of AAA rules, they also have agreed to delegate the issue of arbitrability to the arbitrator.

*Bergeman v. Sullivan, Higgins, Brion*, Case No. 08-cv-162-KI, 2008 WL 2116908, at *3 (D Or

May 14, 2008), citing *Qualcomm*, 466 F3d at 1373 (incorporation of AAA Rules "clearly and

unmistakably shows the parties' intent to delegate the issue of determining arbitrability to an

arbitrator."), citing *Contec Corp. v. Remote Solution Co.*, 398 F3d 205, 208 (2nd Cir 2005).   If

the FAA applied, this court would be constrained to reach the same decision.

However, because the FAA does not apply to Fuqua's alleged Arbitration Agreement,

these cases are distinguishable.  *Rent-A-Center* did not hold that enforceability of a delegation

provision was to be determined by the arbitrator in all cases.  Addressing this same issue, the

California Appellate court noted the narrow scope of *Rent-A-Center*:  "Rent-A-Center was

decided under the FAA, and its holding rests on the fact that the plaintiff had not challenged the

unconscionability of the delegation provision of an arbitration agreement in any of the courts

below." *Htay Htay Chin v. Advanced Fresh Concepts Franchise, Corp.*, 194 Cal App 4th 704,

708-09, 123 Cal Rptr 3d 547, 552 (Cal App 2011).  Rather than applying *Rent-A-Center*, the

court concluded that "[t]he California Supreme Court has declined to consider whether *Rent-A-*

*Center* applies to state courts or whether California would adopt its narrow rule of severability as

a matter of state law.  Whatever its applicability in general, [it] does not aid us in this case.

Normally, the court decides the scope and validity of an arbitration agreement, including whether

it was unconscionable." *Id* at 709, 123 Cal Rptr 3d at 552 (citations and quotations omitted).

Because the FAA does not apply here, this court follows the lead of *Htay Htay Chin* and

declines to consider whether the Oregon court would adopt *Rent-A-Center's* narrow rule of

severability.  Accordingly, this court should resolve the objections raised by Fuqua as to the

enforceability of the Arbitration Agreement which is discussed next.

## C. Unconscionability

Fuqua argues that the Arbitration Agreement is unenforceable because it is

unconscionable.  In Oregon, unconscionability has both a procedural and a substantive

component and is analyzed as follows:

> The primary focus  . . . appears to be relatively clear:  substantial disparity
> in bargaining power combined with terms that are unreasonably favorable
> to the party with the greater power may result in a contract or contractual
> provision being unconscionable.  Unconscionability may involve
> deception, compulsion, or lack of genuine consent, although usually not to
> the extent that would justify rescission under the principles applicable to
> that remedy.  The substantive fairness of the challenged terms is always an
> essential issue.

*Vasquez-Lopez v. Beneficial Oregon, Inc.*, 210 Or App 553, 567, 152 P3d 940, 948 (2007),

quoting *Carey v. Lincoln Loan Co.*, 203 Or App 399, 421-23, 125 P3d 814, 827 (2005).

17 - FINDINGS AND RECOMMENDATION

"Thus, both procedural and substantive unconscionability are relevant, although only substantive unconscionability is absolutely necessary." *Id.* The party asserting unconscionability bears the burden of proof. *Motsinger v. Lithia Rose-FT Inc.,* 211 Or App 610, 614, 156 P3d 156, 160 (2007).

"Procedural unconscionability refers to the *conditions* of contract formation" and "focuses on two factors: oppression and surprise." *Id* (emphasis in original). "Oppression arises from an inequality of bargaining power which results in no real negotiation and an absence of meaningful choice. Surprise involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the terms." *Vasquez- Lopez*, 210 Or App at 567, 152 P3d at 948, quoting *Acorn v. Household Int'l, Inc.*, 211 F Supp2d 1160, 1168 (ND Cal 2002). A contract of adhesion necessarily reflects unequal bargaining power (oppression). *Motsinger*, 211 Or App at 615, 156 P3d at 160, citing *Reeves v. Chemical Indus. Co.*, 262 Or 95, 101, 495 P2d 729, 732 (1972) (defining an adhesion contract as a "take-it-or-leave-it" contract). However, a contract of adhesion is not presumptively void under Oregon law without some evidence of deception, compulsion, or unfair surprise. *Id* at 615-17, 156 P3d at 160-61.

Fuqua argues the unequal bargaining power and surprise make the Arbitration Agreement unconscionable. Even though it was purportedly voluntary, Fuqua believed his job was in jeopardy if he did not sign it unchanged. However, even if procedurally unconscionable, more than a contract of adhesion and unequal bargaining power is required to void an arbitration clause. To satisfy that burden, Fuqua relies on the alleged forgery committed by Kenan. But if the Arbitration Agreement was forged, then it is invalid because it was not signed by him. Alleging a forgery does not present a situation involving any deception as to the conditions under

18 - FINDINGS AND RECOMMENDATION

which the contract was made.  Thus, Fuqua has not presented sufficient facts to avoid

enforcement of the Arbitration Agreement based on unconscionability under Oregon law.

## RECOMMENDATION

For the reasons set forth above, Defendants' Motion to Compel Arbitration and to

Dismiss, or in the Alternative, to Stay This Action (docket # 11) should be DEFERRED pending

trial as to whether the parties actually agreed to arbitration.   The parties should be ordered to

submit a joint proposed expedited case-management plan for resolving this issue.  Since the

parties will still need to incur the costs to resolve the merits of plaintiff's claims either in an

arbitration or a jury trial, they also should be ordered to confer to evaluate whether there is any

cost-effective basis to do so short of incurring the costs of an expedited trial on this threshold

issue.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if

any, are due Monday, April 30, 2012.  If no objections are filed, then the Findings and

Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a

copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings

and Recommendation will go under advisement.

DATED April 13, 2012.

/s Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge

19 - FINDINGS AND RECOMMENDATION